1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

JAIRO CERVANTES, *et al.*,

Plaintiffs,

v.

SAN DIEGO POLICE CHIEF
SHELLEY ZIMMERMAN, *et al.*,

Defendants.

---

BRYAN PEASE,

Plaintiff,

v.

SAN DIEGO COUNTY SHERIFF
WILLIAM GORE, *et al.*,

Defendants.

CONSOLIDATED ACTIONS:

Case No. 17-cv-01230-BAS-AHG
Case No. 18-cv-01062-BAS-AHG

**ORDER:**

**(1) GRANTING IN PART AND DENYING IN PART CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 126);**

**(2) GRANTING COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 127);**

**(3) DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT (ECF No. 139); AND**

**(4) DISMISSING REMAINING STATE LAW CLAIMS WITHOUT PREJUDICE**

The claims in these consolidated civil rights actions arise from protests at a campaign rally for then-presidential candidate Donald Trump at the San Diego Convention Center on May 27, 2016.  Plaintiffs Jairo Cervantes, Madison Goodman, Brandon Steinberg, Nancy Sanchez, and Bryan Pease ("Plaintiffs") allege that several officials with the San Diego Police Department ("SDPD") and the San Diego Sheriff's Department ("SDSD" or "Sheriff's Department") violated their civil rights by preventing their peaceful assembly and arbitrarily arresting "anyone who happened to be in their way, including Plaintiffs."

- 1 -

(*See generally*, Fourth Am. Compl., ECF No. 89.)  Plaintiffs name as defendants Chief of Police Shelley Zimmerman, Lieutenant Ricky Radasa, Officer Samuel Euler, and the City of San Diego ("City Defendants"), and Sheriff William Gore, Captain Charles Cinnamo, and the County of San Diego ("County Defendants").[1]

City and County Defendants have separately moved for summary judgment on Plaintiffs' claims.  (*See* City Defs.' Mot. for Summ. J. ("City Defs.' Mot."), ECF No. 126; Cty. Defs.' Mot. for Summ. J. ("Cty. Defs.' Mot."), ECF No. 127.)  Plaintiffs filed a combined Opposition to Defendants' Motions and a Cross-Motion for Summary Judgment regarding their constitutional claims, *Monell* claims, and claim under the California Bane Act.  (Pls.' Opp'n and Cross-Mot. for Summ. J. ("Pls.' Opp'n & Cross-Mot."), ECF No. 139.)

For the reasons below, the Court **GRANTS IN PART** and **DENIES IN PART** City Defendants' Motion, **GRANTS** County Defendants' Motion, **DENIES** Plaintiffs' Cross-Motion, and **DISMISSES WITHOUT PREJUDICE** the remaining state law claims.

## BACKGROUND

### I.    Factual Background

#### A.    The Rally

On May 27, 2016, then-presidential candidate Donald Trump held a rally at the San Diego Convention Center.  (Jt. Stm. Of Undisputed Facts ("JSUF") ¶ 1, ECF No. 145.)  In response to a request from the SDPD for assistance, the Sheriff's Department dispatched to the rally "a mobile booking team, two mobile field force platoons, an Emergency Response Assistance Team, and their Special Enforcement Detail."  (*Id.* ¶¶ 3–4.)

A command post was set up near Petco Park where different law enforcement agencies assembled as a "unified command" throughout the event.  (Dep. of Shelley

---

[1]  Initially, Plaintiffs Cervantes, Sanchez, Steinberg, and Goodman (collectively, the "Cervantes Plaintiffs") and Plaintiff Pease filed their claims in two separate actions.  (*See Pease v. Gore*, Case No. 18-cv-01062-BAS-AHG (filed May 29, 2018).)  Both actions were consolidated by order of the Court on December 19, 2018.  (ECF No. 68.)

Zimmerman ("Zimmerman Dep.") 38:2–7, 23–24.)[2]  Chief of Police Shelley Zimmerman was in charge of the unified command.  (*Id.* 40:25–41:5, 16–17.)  Zimmerman was there for the entirety of the event, along with other executives, assistant chiefs, and captains. (Dep. of Adam Sharki ("Sharki Dep.") 8:18–9:4.)[3]  The leadership at the command post, including Sheriff's Department Captain Cinnamo, were watching an intermittent live video feed of the area outside the rally from the Airborne Law Enforcement ("ABLE") helicopter, as well as media feeds from news stations and other live-streaming sites.  (Sharki Dep. 10:16–11:10; JSUF ¶ 6.)  When the SDPD required assistance, SDPD officials would relay instructions to Cinnamo at the command post, which he would then dispatch to SDSD's deputies on the ground.  (Dep. of Chad M. Boudreau ("Boudreau Dep.") 32:23–34:3; 34:14–21; 35:24–36:4, Ex. 2 to Pease Decl., ECF No. 139-2.)  Then-Sergeant Radasa (now Lieutenant Radasa) was in charge of a team providing security inside the Convention Center.  (Dep. of Ricky Radasa ("Radasa Dep.") 13:9–18.)[4]

Both supporters and protestors gathered outside the venue during the rally.  Several hundred police officers were either monitoring or actively policing the event.  (Zimmerman Dep. 43:6–14.)  Law enforcement's "main focus was to keep the groups separated[.]"  (*Id.* 60:9.)  Law enforcement ultimately shut down Harbor Drive for safety reasons.  (*Id.* 66:8–14.)

---

[2] Excerpts of Zimmerman's deposition transcript are attached to City Defendants' Motion for Summary Judgment as Exhibit 1 to the Declaration of Catherine Richardson ("Richardson Decl.") (ECF No. 126-4) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 15 to the Declaration of Bryan Pease ("Pease Decl.") (ECF No. 139-2).

[3] Lieutenant Adam Sharki is not a named defendant in this action.  However, he was present at the command post and was responsible for issuing instructions via radio frequencies to field commanders, which included other captains, lieutenants, and sergeants.  (Sharki Dep. 9:22–10:3.)  Excerpts of his deposition transcript are attached to City Defendants' Motion for Summary Judgment as Exhibit 2 to Richardson Declaration (ECF No. 126-5) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 11 to the Pease Declaration (ECF No. 139-2).

[4] Excerpts of Radasa's deposition transcript are attached to City Defendants' Motion for Summary Judgment as Exhibit 9 to Richardson Declaration (ECF No. 126-5) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 4 to the Pease Declaration (ECF No. 139-2).

### B.    Unlawful Assembly

At 4:29 PM, due to escalating violence, law enforcement was directed to make an unlawful assembly declaration.  (City Defs.' Supp. Evid., Video No. 4.)[5]  Consequently, law enforcement declared an unlawful assembly around 4:30 PM using a long-range acoustic device ("LRAD") and the police helicopter.  (JSUF ¶ 9.)

From about 4:40 PM to 4:54 PM, repeated unlawful assembly announcements, in both English and Spanish and with varying degrees of audibility, can be heard in the background of body-worn camera footage.  (Pls.' Supp. Evid., Video Nos. 3, 4, 7, 11.)  The announcements command the crowd to immediately disperse, first toward "L Street east" and onto Harbor Drive.  (*Id.*; *see also* San Diego Regional Officer's Report ("SDRO Rep."),  Ex. 6 to Richardson Decl., ECF No. 126-9.)[6]  Body-worn camera footage from officers in and around the plaza near the Convention Center (sometimes referred to as "Tin Fish Plaza") shows officers directing individuals in the plaza to "move out" alternatively toward 6th and 7th Street or toward Harbor Drive.  Then, from 4:50 PM until about 5:00 PM, officers begin moving a crowd away from the eastern part of L Street into Tin Fish Plaza.  (Pls.' Supp. Evid., Video Nos. 3–6, 8.)

There is some attendant confusion about where and how people were supposed to disperse.  Some people ask officers how to leave; one is directed down a street but returns to inform officers that "they're not letting people out that way," and in one exchange, both officers and a civilian appear unclear about whether people not protesting can remain in

---

[5] Pursuant to the Court's order granting Plaintiffs' Motion to Supplement the Record with footage from officers' body-worn cameras and from the ABLE helicopter that was circling overhead (ECF No. 167), each party submitted 120 minutes of video footage that captured events relevant to the summary judgment motions.  Both parties lodged their selected footage on digital storage devices with the Court.

[6] For example, Lieutenant Christian Sharp made the following announcement twice in English; another officer made the announcement in Spanish:

> I am Lieutenant Christian Sharp from the San Diego Police Department. I hereby declare this to be an unlawful assembly. In the name of the people of the State of California, I command all those assembled on Harbor Drive, that means you, to immediately disperse. You may move east on Harbor Drive. If you do not do so, you will be arrested, we may use chemical agents, and you may be impacted by less lethal munitions. Leave now.

(SDRO Rep.)

the plaza.   (Pls.' Supp. Evid., Video Nos. 4–6, 14.)   Nonetheless, in the 45 minutes after the first unlawful assembly declaration, the crowd is significantly smaller, indicating that most people did, in fact, leave the area.  (City Defs.' Supp. Evid., Video No. 5.)

The Cervantes Plaintiffs were all present near the Convention Center at the time the unlawful assembly was announced.   Plaintiffs Sanchez, Steinberg, and Goodman all testified that they heard at least one (or part of one) unlawful assembly announcement at this time and understood that they needed to leave the area. (Dep. of Nancy Sanchez ("Sanchez Dep.")[7] 31:23–25; Dep. of Madison Goodman ("Goodman Dep.")[8] 38:1–25; Dep. of Brandon Steinberg ("Steinberg Dep.")[9] 39:14–16; 41:8–15.)  Plaintiff Cervantes alleges that he heard the unlawful assembly declaration only once on the Harbor Drive overpass, minutes before his arrest almost two hours after the first declaration was made. (Dep. of Jairo Cervantes ("Cervantes Dep.")[10] 29:11–16; 72:5–9.)

The Cervantes Plaintiffs also state—and Defendants do not dispute—that they were unable to get to their cars at some unspecified point after the unlawful assembly declaration.  Plaintiff Sanchez was directed south toward Chicano Park and was prevented from crossing the pedestrian bridge to return to her car on the eastside of Petco Park. (Sanchez Dep. 44:2–25.)   Similarly, Plaintiffs Steinberg and Goodman were prevented from getting to their car because officers on motorcycles had blocked the street where their car was parked; they were instructed by officers to wait.   (Steinberg Dep. 46:1–11; Goodman Dep. 35:10–35:18.)  Plaintiff Cervantes asked an officer if he could get past the

---

[7] Excerpts of the Sanchez deposition transcript are attached to City Defendants' Motion as Exhibit 9 to the Richardson Declaration (ECF No. 126-12) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 10 to the Pease Declaration (ECF No. 139-2).

[8] Excerpts of the Goodman deposition transcript are attached to City Defendants' Motion as Exhibit 10 to the Richardson Declaration (ECF No. 126-12) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 6 to the Pease Declaration (ECF No. 139-2).

[9] Excerpts of the Steinberg deposition transcript are attached to City Defendants' Motion as Exhibit 11 to the Richardson Declaration (ECF No. 126-14) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 13 to the Pease Declaration (ECF No. 139-2).

[10] Excerpts of the Cervantes deposition transcript are attached to City Defendants' Motion as Exhibit 8 to the Richardson Declaration (ECF No. 126-11) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 3 to the Pease Declaration (ECF No. 139-2).

17cv1230 / 18cv1062

police perimeter but was denied, and he subsequently asked if he could cross the pedestrian bridge to get to his car and was again denied.  (Cervantes Dep. 29:2–6; 31:18–22.)

### C.    Skirmish Line and the Push Down Harbor Drive

Around 5:17 PM, police were instructed to "arrest people not going with the program." (Pls.' Supp. Evid., Video No. 19.)  The ABLE helicopter footage shows a much smaller crowd in the plaza at this time. (City Defs.' Supp. Evid., Video No. 7.)  The police begin forming a perimeter around protestors and funneling them across the trolley tracks and onto Harbor Drive in front of the Convention Center.  (*Id.*, Video No. 5.)  A dispatch over the radio can be heard warning other officers that people are throwing rocks.  (*Id.*, Video No. 6.)

At around 5:29 PM, law enforcement began using a skirmish line to push the crowd south on Harbor Drive, away from the front of the Convention Center and toward the Harbor Drive overpass.   (JSUF ¶ 12; City Defs.' Supp. Evid., Video No. 8.)   Law enforcement continued to push the crowd at a slow pace down Harbor Drive and onto the overpass into the Barrio Logan neighborhood.  The express purpose of the line was to prevent members of the crowd from returning to the Gaslamp District. (Sharki Dep. 29:3–11; 30:11–15.)  At 5:32 PM, officers were instructed to shut down the pedestrian bridge. (City Defs.' Supp. Evid., Video No. 9.)

Officers can be seen making a few other arrests during the push down Harbor Drive. One individual can be seen throwing a projectile, and there are reports that full water bottles are being thrown at officers, though this is not seen on the footage.  (*Id.*, Video Nos. 12, 13, 16; *see also* Lt. Sharki's Timeline, Ex. 3 to Richardson Decl., ECF 126-6.)  Pepper-balls are deployed at some point in response to an individual tossing traffic cones in the direction of officers.  (*Id.*, Video No. 13.)

### D.    Arrests

At 6:33 PM, about an hour after the push down Harbor began and a mile from the Convention Center, police made another unlawful assembly declaration.  They instructed the crowd, which had gathered near the center median on the Harbor Drive overpass, to

17cv1230 / 18cv1062

disperse "eastbound down Harbor" or be arrested.  (City Defs.' Supp. Evid., Video No. 15.)   Plaintiff Pease, who arrived only minutes before this declaration, made an announcement on his megaphone that police were engaging in unlawful conduct by violating the crowd's First Amendment rights.  (Dep. of Bryan Pease ("Pease Dep.") 22:24–23:1, Ex. 14 to Richardson Decl., ECF No. 126-17; Pls.' Supp. Evid., Video No. 36.)

Plaintiffs were among 25 people arrested for failing to disperse in violation of California Penal Code § 409.  (JSUF ¶ 11.)  SDPD arrested Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg on the Harbor Drive overpass.  (*Id.*)  Radasa ordered Pease's arrest east of the overpass; Officer Samuel Euler was part of the arrest team.  (*Id.*; Radasa Dep. 46:24–47:5; 47:17–23.)   All Plaintiffs were then turned over to the Sheriff's Department for booking, though none was ultimately prosecuted.  ( JSUF ¶¶ 15–16, 18.) No Sheriff's Department deputies were part of the police line at the time Plaintiffs were arrested.  (*Id.* ¶ 14.)

## II.   <u>Procedural History</u>

Plaintiffs filed the operative pleading in this action on March 29, 2019 against City Defendants and County Defendants.  (*See* Fourth Am. Compl.)  Plaintiffs allege both state and federal claims against City Defendants.   The Cervantes Plaintiffs allege that Zimmerman and Radasa violated their rights by: (1) "preventing Plaintiffs from peacefully assembling anywhere in the vicinity of the San Diego Convention Center"; (2) "forcing them to march half along Harbor Drive into Barrio Logan"; and (3) "arrest[ing] Plaintiffs arbitrarily." (*Id.* ¶ 46.)   They also allege that Zimmerman "approved and ratified the unlawful arrests" and subsequent detention of Plaintiffs.  (*Id.* ¶ 49.)  Plaintiff Pease separately alleges that Zimmerman, Radasa, and Euler violated his rights by: (1) "preventing Plaintiff from peacefully assembling in a public forum"; (2) "actively preventing Plaintiff from . . . monitoring police activities"; and (3) "arresting him for doing

- 7 -

so." (*Id.* ¶ 86.)[11]  He claims that Zimmerman "ordered SDPD officers and [SDSD] deputies to arrest" those in their immediate vicinity, Radasa "ordered the arrest of Pease" specifically, and Euler arrested Pease, without probable cause, by violently attacking him. (*Id.* ¶¶ 87–89.)

The Fourth Amended Complaint stated eight causes of action ("Counts") that were subsequently modified by the Court's July 29, 2019 Order, which granted dismissal of two of Plaintiffs' claims against County Defendants—one for equitable relief and one for violations of the Fourth Amendment arising from Plaintiffs' post-arrest detention.  (Order Granting in Part and Denying in Part Cty. Defs.' Mot. to Dismiss and Denying Pls.' Mot. for Leave to File a Fifth Am. Compl. ("Order Re: Cty. Defs.' Mot. to Dismiss") at 32, ECF No. 122.)  The below Counts are the subject of the instant summary judgment motions:

- Count 1: *Monell* Claim (All Plaintiffs against All Defendants);

- Count 2: Violation of First and Fourth Amendments – 42 U.S.C. § 1983 (Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg against Defendants Zimmerman, Radasa, Cinnamo, and Gore);

- Count 3: Violation of Cal. Civil Code §§ 51.7, 52.1 (Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg against Defendants Zimmerman, Radasa, and the City);

- Count 4: False Imprisonment – California State Law Tort Claim (Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg against Defendants Zimmerman, Radasa, and the City);

- Count 5: Assault and Battery – California State Law Tort Claim (Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg against Defendants Zimmerman, Radasa, and the City);

---

[11] In the Fourth Amended Complaint, Plaintiff Pease alleges that he was "violently tackled" by Doe Defendants even though, he claims, he was "not resisting in any way."  (Fourth Am. Compl. ¶ 89.) Because Pease does not identify these Defendants or refer to any excessive force claim in the Cross-Motion & Opposition, the Court does not address an excessive force claim in this Order.

- **Count 6**: Negligence – California State Law Tort Claim (Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg against Defendants Zimmerman, Radasa, and the City); and

- **Count 7**: Declaratory Relief (All Plaintiffs Against City Defendants)

- **Count 8**: Violation of First and Fourth Amendment – 42 U.S.C. § 1983 (Plaintiff Pease against Defendants Zimmerman, Radasa, Cinnamo, and Euler).[12]

(*See* Fourth Am. Compl.; Order re Cty. Defs.' Mot. to Dismiss.)

The City Defendants and County Defendants filed their respective summary judgment motions on September 20, 2019. (City Defs.' Mot.; Cty. Defs.' Mot.) Plaintiffs filed a single brief containing both their joint Opposition to the motions and joint Cross-Motion for Summary Judgment on November 5, 2019. (Pls.' Opp'n & Cross-Mot.) The County Defendants and City Defendants separately filed their combined Reply and Opposition to Plaintiff's Cross-Motion on December 10, 2019. (Cty. Defs.' Reply & Opp'n to Pls.' Cross-Mot. ("Cty. Defs.' Reply & Opp'n"), ECF No. 143; City Defs.' Reply & Opp'n to Pls.' Cross-Mot. ("City Defs.' Reply & Opp'n"), ECF No. 144.) Plaintiffs jointly filed a Reply in support of the Cross-Motion on December 23, 2019. (Pls.' Reply in Supp. of Cross-Mot. ("Pls.' Reply"), ECF No. 146.)

## LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute

---

[12] The Fourth Amended Complaint also named SDPD officer Tony Maraschiello as a Defendant, and he was included in the Eighth Cause of Action brought by Plaintiff Pease. However, the Court terminated Maraschiello as a defendant at Pease's request on July 29, 2019. (Order re Cty. Defs.' Mot. to Dismiss.)

about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party meets this initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient.") (citing *Anderson*, 477 U.S. at 252). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)); *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) (holding that the district court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found").

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## ANALYSIS[13]

### I.   City Defendants' Motion for Summary Judgment

City Defendants move for summary judgment on Plaintiffs' constitutional claims, related municipal liability claims, various state tort law claims, and request for declaratory relief.  For the reasons stated below, the Court **GRANTS IN PART** and **DENIES IN PART** City Defendants' Motion for Summary Judgment.

### A.   First Amendment Claims – 42 U.S.C. § 1983 (Counts 2 and 8)

Plaintiffs allege City Defendants' conduct prevented them from peaceably assembling near the Convention Center.[14]  (*See* Pls.' Opp'n & Cross-Mot. at 16; *see also* Fourth Am. Compl. ¶¶ 46, 47, 49, 86–89.)  Specifically, Plaintiffs argue that the criteria for an unlawful assembly no longer existed at the time City Defendants' used a skirmish line to enforce the dispersal order, and that their purported reasons for doing so—to prevent the crowd from returning to the site where the unlawful assembly was declared—violated Plaintiffs' right to peaceably assemble.[15]  (Pls.' Opp'n & Cross-Mot. at 14.)

On summary judgment, City Defendants contend that they caused no constitutional injury because the crowd refused to comply with a lawful order and continued to engage in violent acts.  (City Reply at 16–17.)  They also move for summary judgment on the alternative basis that Chief of Police Shelley Zimmerman, Lieutenant Ricky Radasa, and Officer Samuel Euler ("Individual City Defendants") are entitled to qualified immunity.

---

[13] Regarding Defendants' objections to the purported "facts" stated in Plaintiffs' Cross-Motion and Opposition (ECF No. 139), the Declaration of Bryan Pease (ECF No. 139-1), and the Declaration of David Myers (ECF No. 139-3), the Court did not rely on the content of any of these documents to make the determinations contained herein.  Therefore, City Defendants' objections are moot.

[14] In their summary judgment brief, Plaintiffs imply that City Defendants' dispersal decisions were based on the content of the crowd's political message.  (*See, e.g.*, Opp'n & Cross-Mot. at 11 (alleging that "[SDSD] and SDPD acting in concert dispersed only the anti-Trump protest area, including Plaintiffs, out onto Harbor Drive," while the pro-Trump demonstrators were "left alone").  However, the Court previously denied Plaintiffs leave to amend their complaint to add viewpoint discrimination claims.  *See Cervantes v. Zimmerman*, No. 17-CV-1230-BAS-NLS, 2019 WL 1129154, at *10–11, *13 (S.D. Cal. Mar. 12, 2019).  Plaintiffs did not request reconsideration of this decision or otherwise move to revive this type of claim.  Thus, the Court will not address a viewpoint discrimination claim on summary judgment.

[15] Plaintiffs are clear that their alleged constitutional injuries do not stem from City Defendants' declaration of an unlawful assembly.  (Opp'n & Cross-Mot. at 6, 13.)

### 1.   Right to Peaceably Assemble

The First Amendment protects the right to peaceably assembly by ensuring the freedom of individuals to associate for the purpose of engaging in protected speech. *Jefferson v. City of Fremont*, No. C-12-0926 EMC, 2013 WL 1747917, at \*5 (N.D. Cal. Apr. 23, 2013) (citing *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006)); *see also Givens v. Newsom*, No. 2:20-CV-00852-JAM-CKD, 2020 WL 2307224, at \*7 (E.D. Cal. May 8, 2020) ("[T]he freedom of association has largely subsumed the freedom of assembly."), *appeal filed* (9th Cir. May 19, 2020).

For this reason, the right to peaceably assemble requires that individuals invoking its protection are "engag[ing] in some form of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (recognizing right to associate "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.")).   "Accordingly, a police officer violates a person's First Amendment rights if, by his actions, he deters or chills the person's political speech and such deterrence is a substantial or motivating factor in taking the actions." *Hicks v. City of Portland*, No. CV 04-825-AS, 2006 WL 3311552, at \*12 (D. Or. Nov. 8, 2006) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1999); *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999)).

### 2.   The Cervantes Plaintiffs' First Amendment Claim

The Court first turns to whether the Cervantes Plaintiffs have alleged a violation of their First Amendment rights.  *See Cty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged the deprivation of a constitutional right at all.").  Considering the undisputed facts in the record, the Court finds the Cervantes Plaintiffs had no First Amendment right to peaceably assemble when police began enforcing the dispersal order because that order was made pursuant to a valid unlawful assembly declaration.

Under California law, an unlawful assembly occurs "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner." Cal. Pen. Code § 407. Once an unlawful assembly is declared, municipal actors such as "the sheriff of the county and his deputies" must "go among the persons assembled, or as near to them as possible, and command them, in the name of the people of the State, immediately to disperse." *Id.* § 726.

It is undisputed here that police followed this protocol and had a basis for doing so. They made multiple unlawful assembly announcements between 4:30 PM and 5:00 PM stating that the assembly was unlawful, ordering the crowd to disperse, and threatening arrest if the order was not followed. (*See* Defs.' Supp. Evid., Video Nos. 3, 4, 6, 8; SDRO Rep.; *see also* Sanchez Dep. 31:23–25; Goodman Dep. 38:1–25; Steinberg Dep. 39:14–16, 41:8–15 (testifying that they heard all or part of the declarations and understood that they needed to leave the area).) The Cervantes Plaintiffs do not contest that they were still in the area of the unlawful assembly at the time the dispersal effort began.

The Cervantes Plaintiffs had no First Amendment right to remain in the area of a protest or riot after police issued an order to disperse and were violating the law by doing so. *See Hicks*, 2006 WL 3311552, at *12 (citing *Colten v. Kentucky*, 407 U.S. 104, 109 (1972) ("Plaintiff had no protected First Amendment right to enter the street in violation of a lawful order to disperse."); *Cavanagh v. Humboldt Cty.*, No. C 97-4190 CRB, 1999 WL 96017, at *4 (N.D. Cal. Feb. 22, 1999) (finding that officers properly declared an unlawful assembly and dispersed the crowd where plaintiffs failed to apply for required permit), *aff'd*, 1 F. App'x 686 (9th Cir. 2001); *see also People v. Uptgraft*, 8 Cal. App. 3d Supp. 1, 5 (1970) ("The fact that people assert First Amendment rights does not place them above the law and immunize them from obeying state laws, so long as such state laws are enforced fairly and without discrimination.") (citing cases).[16] Thus, once City Defendants

---

[16] In the context of a loitering ordinance, the Supreme Court has held that the Due Process Clause of the Fourteenth Amendment protects an individual's right to remain in a place of one's choosing. *See City of Chicago v. Morales*, 527 U.S. 41, 54 (1999). However, Plaintiffs do not raise a Fourteenth Amendment claim and instead proceed solely under the First Amendment. Therefore, the Court does not address such

declared an unlawful assembly—the legality of which is not challenged by the Cervantes Plaintiffs—City Defendants then "acted within the proper scope of their authority by dispersing the crowd," which included Plaintiffs.  *Cavanagh*, 1999 WL 96017, at *4.

The Cervantes Plaintiffs also appear to argue that once they were moved onto Harbor Drive, the crowd no longer constituted an unlawful assembly, thereby divesting police of lawful authority to disperse the crowd.  (Pls.' Opp'n & Cross-Mot. at 6.)  In support of this notion, the Cervantes Plaintiffs argue that "[t]he only lawful basis for declaring an assembly unlawful is widespread violence or threat of widespread violence."  (*Id.* at 14.)  This is a misstatement of the law.  The First Amendment does not prohibit dispersing assemblies that are violent, "pose a clear and present danger of imminent violence, or . . . *violat[e] some other law in the process*."  *Collins v. Jordan*, 110 F.3d 1363, 1371–72 (9th Cir. 1996) (emphasis added).  However, the Cervantes Plaintiffs do not cite to any authority—nor can the Court find any—to support the proposition that they could lawfully remain in the area of an unlawful assembly despite the order to disperse.  Nor does existing case law establish, or even suggest, that the First Amendment prohibits law enforcement from enforcing a dispersal order under the circumstances present in this case.

Thus, in the period following the unlawful assembly declaration and dispersal order, the Cervantes Plaintiffs' had no corresponding First Amendment right to remain in the area of the unlawful assembly.  Accordingly, the Cervantes Plaintiffs suffered no First Amendment injury as a matter of law.

### 3.   Plaintiff Pease's First Amendment Claim

Pease's First Amendment claim occurred in a different factual context.  He was not subject to the bulk of the dispersal effort. City Defendants began this effort at around 5:30 PM,  and Pease testifies that he did not arrive on the scene until minutes before law enforcement made another unlawful assembly announcement on the Harbor Drive overpass.  (*See* Pease Dep. 22:24–23:1 (testifying that he arrived on the scene at 6:30 PM).)

---

a claim here.  *See Am. Fed'n of Labor-Congress of Indus. Org. v. City of Miami*, 650 F. Supp. 2d 1258, 1274 n.7 (S.D. Fl. 2009).

Even viewing the facts in a light favorable to Pease, there is no evidence creating a material issue of fact that the effect of City Defendants' dispersal efforts on Pease's First Amendment activities were anything other than the unintended consequence of an otherwise constitutional police action that was already in progress. *C.f. Index Newspapers*, 2020 WL 4220820, at *6 (finding serious questions going to the merits of First Amendment retaliation claim where evidence did not support that force used against plaintiffs was the unintended consequence of crowd control); *see also Barney v. City of Eugene*, 20 F. App'x 683, 685 (9th Cir. 2001) (unpublished).

However, Pease also alleges that he was engaged in "constitutionally protected conduct," including filming law enforcement, informing police that they were violating the law, and asking how far they planned to proceed down Harbor Drive, before he was arrested. (Fourth Am. Compl. ¶¶ 80–89.) Pease specifically alleges, in the context of the Bane Act claim, that then-Sergeant Radasa "targeted Pease for arrest . . . due to his perception of legitimacy as a City Attorney candidate, and the fact that he was stating that what the police were doing was illegal." (Pls.' Opp'n & Cross-Mot. at 20.) Therefore, the Court understands Pease to allege that his arrest was in retaliation for his speech.

It is undoubtedly the case that Pease was engaged in activity protected by the First Amendment before his arrest. He testified that he arrived at the east end of Harbor Drive at 6:30 PM to "to document the police activity as well as to engage in free speech" and inform others, including the media, about the lawfulness of their actions. (Pease Dep. 22:24–23:6, 35:22–36:4, 54:22–55:15, 56:20–25; Pls.' Supp. Evid., Video Nos. 34, 37.) Pease's right to verbally challenge and monitor police conduct is  a core constitutional right. *See City of Houston, Tex. v. Hill*, 482 U.S. 451, 462–63 (1987) ("The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."); *see also Index Newspapers*, 2020 WL 4220820, at *2, 5 (finding that legal observers present at protests "for the purpose of documenting police interactions with protesters" were engaged in constitutionally protected First Amendment activity).

Having established that Pease engaged in expressive conduct, two additional elements must be satisfied to prevail on a First Amendment retaliatory arrest claim: First, that the officers' conduct would "chill a person of ordinary firmness from future First Amendment activity," and second, that the officers' desire to chill his speech was a but-for cause of the arrest. *Lacey v. Maricopa Cty.*, 693 F.3d 896, 917 (9th Cir. 2012). The Supreme Court has recently clarified that but-for causation, in this context, requires the plaintiff to "plead and prove the absence of probable cause for the arrest." *Nieves v. Bartlett*, __ U.S. __, 139 S. Ct. 1715, 1724 (2019). A plaintiff is not required to show probable cause if the plaintiff "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.* at 1727.

Pease must therefore show that then-Sergeant Radasa not only acted with retaliatory motive to suppress his speech, but that this retaliatory motive was the "but-for" cause of his arrest. *See Hartman v. Moore*, 547 U.S. 250, 259–60 (2006). To that end, Pease cites to Radasa's testimony that part of his probable cause assessment was based on Pease's audible statements about unlawful police conduct coupled with his sign identifying himself as a candidate for City Attorney. (Radasa Dep. 51:2–52:9.) Radasa testified that this gave Pease credibility with the crowd and effectively contributed to their defiance of the dispersal order. (*Id.*)

As explained below in Section I.B.2.b.ii., however, the Court finds that Pease has not shown the absence of probable cause for his arrest because City Defendants had probable cause to arrest Pease for failing to disperse. Further, even when construed in a light most favorable to Pease, the evidence reflects that the motivations of the arresting officer, Euler, concerned only Pease's failure to disperse. The narrative in Pease's arrest report, completed by Euler, states that he was arrested for refusing to disperse and that there were no other facts underlying Pease's arrest. (Euler Dep. 20:11–15; 21:15–28.) Pease does not submit any evidentiary support to raise a genuine factual issue about Euler's motivations; indeed, there is also no evidence to suggest that Euler heard Pease's verbal

17cv1230 / 18cv1062

challenge to police or that he saw his sign for the City Attorney campaign, such that his reasons for executing the arrest were based on Pease's expressive conduct.  *See Nieves*, 139 S. Ct. at 1727–28 (affirming summary judgment on a retaliation claim because the record contained insufficient evidence of what motivated the arresting officer); *Lozman v. Riviera Beach*, __ U.S. __, 138 S.Ct. 1945, 1953–54 (2018) (finding a plaintiff "likely could not have maintained a retaliation claim against the arresting officer" when there was "no showing that the officer had any knowledge of [the plaintiff's] prior speech").  Thus, it appears Pease "was not arrested for his speech, he was arrested for his conduct."  See *Blackmore v. City of Phoenix*, 126 F. App'x 778, 781 (9th Cir. 2005) (unpublished) (citing *Whren v. United States*, 517 U.S. 806, 812 (1996)).

Lastly, Pease has not shown that the exception to the "no probable cause" requirement applies in this case.  He proffers no objective evidence that police have "typically exercise[d] their discretion" not to arrest others similarly situated to Pease—that is, individuals such as legal observers who publicly challenge police conduct in their capacity as attorneys.  *Id.*

Thus, the Court finds that no reasonable jury could find that Pease's First Amendment rights were violated by City Defendants.

### 4.   Qualified Immunity

To overcome the heavy burden of qualified immunity, Plaintiffs must show that "(1) the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Because the Court finds that the factual record, even when viewed most favorably to Plaintiffs, fails to demonstrate a constitutional violation of their First Amendment rights as a matter of law, City Defendants are entitled to qualified immunity on the first prong of this analysis alone.  Moreover, even if the Cervantes Plaintiffs had made a colorable constitutional claim as a matter of law, there is no clearly established law that the use of the skirmish line to disperse Plaintiffs over a mile—executed pursuant to an unlawful

assembly declaration (the validity of which is not at issue)—violates First Amendment rights to speech and assembly.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, __ U.S. __, 136 S. Ct. 305, 308 (2015) (quotations omitted). "The threshold determination of whether the law governing the conduct at issue is clearly established is a question of law for the court." *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993). The inquiry requires courts to determine if "the violative nature of particular conduct is clearly established," *id.* at 742, and therefore "must be undertaken in light of the specific context of the case, not as a broad general proposition," *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

"Clearly established law" does not require "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741. "It is the plaintiff who bears the burden of showing that the rights allegedly violated were 'clearly established.'" *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (quotations omitted). A plaintiff must "point to" controlling case authority—either from the Ninth Circuit or Supreme Court "or otherwise . . . embraced by a 'consensus' of courts outside the relevant jurisdiction" to show that the right is clearly established. *Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017).

### (a)   *Dispersal Down Harbor Drive*

The relevant question here is whether a reasonable officer, given the circumstances, could have believed the dispersal efforts were lawful, "in light of clearly established law and in the information the . . . officers possessed." *Knox v. Southwest Airlines*, 124 F.3d 1103, 1108 (9th Cir. 1997) (citation and quotations omitted).

As aforementioned, police are permitted to enforce a dispersal order if an unlawful assembly declaration was properly made. The Cervantes Plaintiffs have not identified any controlling precedent—and the Court knows of none—circumscribing law enforcement's ability to forcibly disperse a crowd after an unlawful assembly is declared when the crowd does not voluntarily comply. *See Sharp*, 871 F.3d at 911. Because there is no binding

authority limiting the scope or extent of police authority to enforce a lawful dispersal order in the First Amendment context,[17] the Court cannot conclude that it would be clear to a reasonable officer that the enforcement action taken to disperse Plaintiffs on the day of the rally violated their right to peaceably assemble. *See Saucier*, 533 U.S. at 201. As such, City Defendants are entitled to qualified immunity for this conduct.

(b)   *First Amendment Retaliation*

As to Pease's First Amendment retaliation claim, the issue of whether a First Amendment retaliatory arrest claim may lie even if probable cause existed for the arrest was unresolved until the Supreme Court issued *Nieves* in 2019, three years after Pease's arrest in this case. *See Wilson v. Layne*, 526 U.S. 603, 614 (1999) ("Since the police action in this case violated petitioners' Fourth Amendment right, we now must decide whether this right was clearly established *at the time of the search*.") (emphasis added). In fact, in a case predating Pease's arrest, the Supreme Court had granted qualified immunity to a police officer in similar circumstances on the ground that "it was not clearly established that an arrest supported by probable cause could violate the First Amendment." *See Reichle v. Howards*, 566 U.S. 658, 663 (2012). Thus, City Defendants are also entitled to qualified immunity for Pease's First Amendment claim.

Accordingly, the Court grants summary judgment in City Defendants' favor on Plaintiffs' First Amendment claims.

## B.   Fourth Amendment Claims – 42 U.S.C. § 1983 (Counts 2 and 8)

Plaintiffs allege that both City Defendants' forcible movement of the crowd down Harbor Drive and Plaintiffs' subsequent arrests infringed on their Fourth Amendment rights against unlawful seizures. (Pls.' Opp'n & Cross-Mot. at 16–17; *see also* Fourth Am. Compl. ¶¶ 46, 85–86.) City Defendants move for summary judgment on Plaintiffs' Fourth Amendment claims because, they argue, Plaintiffs have not stated a violation of their rights

---

[17] The Court recognizes that there are several limitations to enforcement of a police dispersal order in the Fourth Amendment excessive force context, a claim which is not raised in this action.

and the officers are entitled to qualified immunity.  (Mem. of P. & A. in supp. of City Defs.' Mot. ("City Defs.' Mem. of P. & A.") at 2–3, ECF No. 126-1.)

The Court again turns to whether Plaintiffs' constitutional claims withstand summary judgment before turning to Defendants' qualified immunity defense.  *See Lewis*, 523 U.S. at 841 n.5.  The Court considers the "forced movement" seizure claim only as to the Cervantes Plaintiffs, as Plaintiff Pease was not present at the time of the dispersal down Harbor.  The seizure claim based on arrests is discussed as to all Plaintiffs.

In order to prove City Defendants deprived the Cervantes Plaintiffs of their Fourth Amendment right to be free from an unreasonable seizure, Plaintiffs must show: (1) Defendants seized each Plaintiff's person; (2) in seizing each Plaintiff's person, Defendants acted intentionally; and (3) the seizure was unreasonable.  *Brower v. Cty. of Inyo*, 489 U.S. 593, 596 (1989).

### 1.   Whether a Seizure Occurred

For a "seizure" to have occurred, "there must either be some application of physical force, even if extremely slight, or a show of authority to which the subject yields." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred.").  Courts must consider, "in view of all of the circumstances surrounding the incident," whether "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see Florida v. Bostick*, 501 U.S. 429, 439 (1991) ("[A] court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.").

The Ninth Circuit has adopted a five-factor test to determine whether a reasonable person would have felt "at liberty to ignore the police presence and go about his business": "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter

occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (citing *Orhorhaghe v. INS*, 38 F.3d 488 (9th Cir. 1994)).

(a)     *Forced Movement Down Harbor Drive*

Here, the Court finds that the facts, when viewed most favorably to the Cervantes Plaintiffs, raise a genuine issue as to whether the forcible dispersal down Harbor Drive constituted a seizure.   There was a substantial police presence during the dispersal, including multiple law enforcement agencies. (*See* Zimmerman Dep. 38:25–39:8 (testifying that California Highway Patrol, several cities' police departments, and the Sheriff's Department were part of the "unified command"); Radasa Dep. 12:18–19, 57:8–9 (noting CHP's presence in the area).)   Law enforcement also appeared armed, equipped with batons, and possessed and used "less lethal munitions" to enforce dispersal. (*See, e.g.*, Defs.' Supp. Evid., Video No. 4; Lt. Sharki's Timeline (indicating "OC Spray" and "pepperball" deployment at various points during dispersal).)   While it does appear that the entirety of this encounter took place on a public roadway, Plaintiffs' testimony reflects that police were conducting themselves, at this point, in a manner that Plaintiffs understood to compel compliance. (*See, e.g.*, Steinberg Dep. 49:12–20 (testifying that he did not ask officers to return to his car because "they were in formation" and "seemed very aggressive"); Cervantes Dep. 32:17–24 (testifying that he "followed directions" and proceeded down Harbor Drive).)   Lastly, although City Defendants emphasize that the crowd could have terminated the encounter by proceeding further down Harbor Drive, the Court again notes that the record does not reflect that the police instructed the crowd to do so before the second set of unlawful assembly declarations was announced around 6:30 PM.

The Court finds that a reasonable jury could conclude the evidence demonstrates Plaintiffs were seized.[18]

(b)     *Arrests*

Plaintiffs also allege that City Defendants violated their Fourth Amendment rights by arresting them without probable cause. It is well-established that an arrest constitutes a seizure under the Fourth Amendment. *Hodari D.*, 499 U.S. at 624 (identifying an arrest as "the quintessential 'seizure of the person' under our Fourth Amendment jurisprudence"). "A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

2.     Whether the Seizures Were Unreasonable

Even if Plaintiffs were seized, however, the undisputed facts fail to demonstrate that City Defendants' continued dispersal effort following the unlawful assembly declaration was unreasonable as a matter of law. *See Brower*, 489 U.S. 593 at 599 ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"). Generally, arrests and seizures that fall short of technical arrests are reasonable only if they are based on probable cause that a crime was committed or is being committed. *Dunaway v. New York*, 442 U.S. 200, 214 (1979) ("For all but those narrowly defined intrusions, . . . seizures are 'reasonable' only if supported by probable cause.").

"Probable cause exists when, 'under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime.'" *United States v. Pannell*, 28 F. App'x 696, 698 (9th Cir. 2002) (unpublished) (quoting *United States v. Smith*, 790 F.2d 789, 792 (9th

---

[18] Courts in this circuit have reached the same conclusion under very factually similar circumstances, finding that "physically moving certain plaintiffs and circumscribing the area of movement of other plaintiffs" constitutes a seizure. *See Coles v. City of Oakland*, No. C03-2961 TEH, 2005 WL 8177790, at *1 (N.D. Cal. Apr. 27, 2005) (finding Fourth Amendment seizure claim withstood dismissal where police used force to move plaintiffs as part of police's crowd-control or crowd-dispersal tactics); *Marbet v. City of Portland*, No. CV 02-1448-HA, 2003 WL 23540258, at *10 (D. Or. Sept. 8, 2003) (denying dismissal of Fourth Amendment seizure claim where defendants admitted to using pepper spray and physical force to physically move protesters 120 feet to create a larger entryway to the street).

Cir. 1986)).  Generally, probable cause requires "a reasonable ground for belief of guilt, and that the belief of guilt must be particularized with respect to the person to be searched or seized."  *Id.* at 371 (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949) and *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).  To determine if probable cause was established at the time of the arrests, the Court must examine the events leading up to the arrests and decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause" to arrest Plaintiffs for failing to disperse under § 409.  *See Ornelas v. U.S.*, 517 U.S. 690, 696 (1996).  "Probable cause must exist from facts and circumstances known to the officers at the moment of arrest."  *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988).

Defendants argue summary judgment is appropriate because there is no dispute of fact that probable cause existed to arrest Plaintiffs for violating California Penal Code § 409.  This statute provides:

> Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in attempting to disperse the same, is guilty of a misdemeanor.

Cal. Penal Code § 409.  This code section applies to bystanders as well as participants in an unlawful assembly.  *See Dubner v. City & Cty. of San Francisco*, 266 F.3d 959, 967 (9th Cir. 2001) (citing *People v. Anderson*, 117 Cal. App. Supp. 763, 769 (1931) (distinguishing between § 409, which applies to "every person . . . who remains at the place of assembly, after the proper warning, although he may not have participated in the assembly" and § 416, which requires unlawful purpose and applies to "only the participators")).

The objective of this statutory provision "is to enable law enforcement officers to de-fuse riotous situations by ordering persons to remove themselves from the area without any need to distinguish between the rioters and bystanders whose very presence aggravates the problem of restoring tranquility."  *People v. Cipriani*, 18 Cal. App. 3d 299, 309 (1971).  Therefore, "[t]here is no requirement that a defendant actually participate in the riot or

unlawful assembly in order for him to be guilty of violating this section." *Id.* A violation of § 409 requires only "that the scene in question was the place of a riot or of a rout or of an unlawful assembly; that the petitioners, along with the other persons present, had been lawfully warned to disperse; and that the petitioners heard the warning and failed to disperse." *In re Wagner*, 119 Cal. App. 3d 90, 105 (Ct. App. 1981).

The Court must therefore determine whether City Defendants had probable cause to seize Plaintiffs for violating § 409. The existence of probable cause to arrest is generally an issue for a jury; summary judgment is only appropriate if no reasonable jury could find an absence of probable cause under the facts. *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994). "In making the probable cause determination," the Court views "the evidence in the light most favorable to the party opposing summary judgment"—in this case, Plaintiffs. *Id.*

### (a)   *Forced Movement Down Harbor Drive*

The Cervantes Plaintiffs challenge the extent of the dispersal, arguing that the two-hour long effort that continued for a mile down Harbor Drive was not warranted given the relatively calm nature of the crowd. (Pls.' Opp'n & Cross-Mot. at 6, 9, 13.) City Defendants claim that the skirmish line was necessary because the crowd continued to violate the dispersal order and were being "violent and assaultive" toward officers. (City Defs.' Mem. of P. & A. at 3–4.) In the situation at bar, police would have required probable cause to believe that Plaintiffs had failed to disperse before taking action to forcibly move them down Harbor.

Even under an examination of the record most advantageous to the Cervantes Plaintiffs, the Court concludes no reasonable jury could find an absence of probable cause for the initial push down Harbor Drive. First, the Cervantes Plaintiffs were all present at the scene of a protest at the time it was declared an unlawful assembly; most of them even heard the unlawful assembly declaration. (*See* Sanchez Dep. 31:23–32:23 (testifying that she heard "several announcements" about the unlawful assembly); Goodman Dep. 30:3–6, 38:1–25 (testifying that he heard announcements by the police and understood that he

17cv1230 / 18cv1062

needed to leave the area); Steinberg Dep. 39:14–24 (testifying that he was "[b]etween the Convention Center and where the buildings to the city started" when he heard the first unlawful assembly announcement), 40:13–16 (recalling being told he needed to leave the area or be arrested).)[19]   Second, it is undisputed that they were all in the area where the unlawful assembly had been declared until the skirmish line was formed to forcibly disperse individuals down Harbor Drive.

A separate question, however, is whether the Cervantes Plaintiffs had an opportunity to leave the area before they were corralled onto Harbor Drive along with the remaining crowd.   Some case law specifically concerning dispersals of unlawful assemblies has concluded that probable cause for failure to disperse exists only where the dispersal order was lawful and where individuals have a chance to disperse.   *See Barnham v. Ramsey*, 434 F.3d 565, 575 (D.C. Cir. 2006) ("[W]hen compelling circumstances are present, the police may be justified in detaining an undifferentiated crowd of protestors, but only after providing a lawful order to disperse followed by a reasonable opportunity to comply with that order."); *see also Wash. Mobilization Committee v. Cullinane*, 566 F.2d 107, 121 (D.C. Cir. 1977) ("If all members of a group are arrested the prosecutor may well be able to prove, by the testimony of policemen who were at the scene, that there was probable cause to believe that the group as a whole was violating the law . . . by remaining on the scene after reasonable notice and opportunity to disperse."); *Lyons v. City of Seattle*, 214 F. App'x 655 (9th Cir. 2006) (unpublished) (finding probable cause for arrests where it was reasonable for officers to have believed there was a "fair probability" the plaintiffs heard dispersal orders and failed to comply—even if the officers were not aware if plaintiffs' intentionally refused to do so—where the plaintiffs acknowledged that exits were available and others were able to disperse); *Hickey v. City of Seattle*, No. C00-1672 MJP, 2006 WL

---

[19] Cervantes alleges that he did not hear the unlawful assembly declaration, although the person he was with, Nancy Sanchez, testified that she heard several. (Cervantes Dep. 29:11–16.)   Even if Cervantes had not heard the declarations, police had a fair probability of believing that Cervantes had heard the announcement given his presence at the scene.   *See Lyons v. City of Seattle*,  214 F. App'x 655, 657–58 (9th Cir. 2006) (unpublished).

3692658, at *9 (W.D. Wash. Dec. 13, 2006) (noting, in dicta, that if officers issue an order to disperse, and if individuals remain in the area thereafter, "the officers would have . . . circumstantial evidence supporting an individualized suspicion that each of the remaining class members were not [lawfully present] and were knowledgeable about their violation").

The Cervantes Plaintiffs each claim that they tried to leave the area but were either prevented from doing so by law enforcement or instructed by officers to wait.  (*See* Cervantes Dep. 31:18–22; Sanchez Dep. 33:5–11; Steinberg 42:1–4; Goodman Dep. 35:16–18; 64:4–13.)   However, the Court notes that Plaintiffs do not specify when they tried to leave the area or claim that they did not have enough time to leave.

Further, undisputed evidence shows that there was a reasonable opportunity to leave the area, as most people had left during the period after the unlawful assembly was declared and before the skirmish line formed to funnel individuals onto Harbor Drive.  (*See* Sharki Dep. 37:16–38:1; 38:5–14; 62: 21–23 (stating that people had the ability to leave—and did leave—through the "large gaps" by a utility box and near "the area along the trolley platform where there's no law enforcement presence"); Zimmerman Dep. 71:7–10, 19–25; 75:5–7 (testifying that most people "peacefully left" in "pretty short order" after the numerous dispersal orders were given); Cinnamo Dep. 93:17–22; 94:8–17 (testifying that people left the area after the first unlawful assembly announcement and "everywhere in between up to the point where we actually started forcibly moving people" and that the crowd became "much smaller" as a result); *see also* SDRO Rep.)   Even the Cervantes Plaintiffs describe the crowd size around this time as "relatively small."  (Pls.' Opp'n & Cross-Mot. at 10.)   This is corroborated by the body-worn camera and ABLE footage. Based on the timestamps, 46 minutes elapsed between the first unlawful assembly declaration (4:30 PM) and law enforcement's initial attempts to corral the crowd onto Harbor Drive (5:16 PM), and aerial footage of the crowd shows that it became substantially smaller over this period.  (Defs.' Supp. Evid., Video No. 5.)  *See Duclos v. Tillman*, No. 14-CV-149-BAS (KSC), 2016 WL 8672917, at *2 (S.D. Cal. Mar. 11, 2016) ("[T]he

existence of unambiguous video footage can alter how the district court assesses the facts of the case.") (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)).[20]

Lastly, no testimony was elicited identifying the specific officers who had denied the Cervantes Plaintiffs the ability to leave the area in the first place.  (*See* Cervantes Dep. 29:2–6; Sanchez Dep. 33:5–11; Steinberg 42:1–4; Goodman Dep. 35:10–18 (identifying various individuals as "officers," "guards," "the police," "cops," and "law enforcement" ). While courts can, in certain circumstances, look to the "collective knowledge" of all officers in assessing the totality of circumstances for probable cause determinations, *United States v. Bertrand*, 926 F.2d 838, 845 (9th Cir. 1991), this requires either an ongoing investigation where law enforcement officers may not explicitly communicate facts independently learned, or, where no investigation is ongoing, there is communication of key facts underlying probable cause between those with direct knowledge and those conducting the seizure.  *United States v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (quoting *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007)).[21]  "In both situations, collective knowledge may be imputed only if there has been some communication among agents."  *Id.*

This collective knowledge doctrine simply does not apply to the instant facts.  First, there is no evidence that any of the law enforcement officers in this situation were "working together in an investigation."  *See id*.  Second, there is no evidence of communications between the unidentified officers with knowledge that the Cervantes Plaintiffs were trying to leave and officers who were involved in deciding to use the skirmish line to effect

---

[20] Notably, Radasa testified that SDPD was not responsible for sealing off access to the side streets; rather, he testified that he believed California Highway Patrol had lined those streets with its own personnel. (Radasa Dep. 11:23–12:23; 57:6–9.)

[21] In *Villasenor*, the Ninth Circuit applied this doctrine to the inverse argument—that the collective knowledge doctrine should apply to show that the requisite knowledge for a seizure did *not* exist.  A defendant claimed that an ICE officer who conducted a stop of his vehicle could not have reasonably believed his car contained drugs because he "knew or should have known" that the dog who sniffed his car at the border during secondary inspection with CBP failed to alert.  608 F.3d at 475.  The court found that the doctrine did not apply because there was no evidence of an investigation between the ICE and CBP officers or that the ICE officer stopped the defendant at CBP's direction.  *Id.* at 475–76.

dispersal.  *See id.* at 476; *c.f. Merritt v. Ariz.*, 425 F. Supp. 3d 1201, 1215 (D. Ariz. 2019) (declining to apply the collective knowledge doctrine to establish probable cause where the government failed to "identify any officer" who had the requisite knowledge before the plaintiff's arrest that could then "be attributed to all of the officers").  In fact, Zimmerman testified that she "had no information" that the members of the remaining crowd had at any time made any request to return to their car and intended to leave.  (Zimmerman Dep. 116:24–117:4; 138:23–24; 139:12–17.)

Thus, the undisputed facts demonstrate that probable cause existed for the initial seizure effected by the skirmish line and was therefore reasonable.

### (b)   *Arrests*

Because the totality of circumstances leading up to the arrests of the Cervantes Plaintiffs and Pease are slightly different, the Court addresses each separately below.

### i.   Cervantes Plaintiffs

On the factual record presented by the parties, a reasonable factfinder could conclude only that City Defendants made an "entirely reasonable inference" that the Cervantes Plaintiffs had refused to disperse at the time of their arrests.  *See Pringle*, 540 U.S. at 586.  As stated above, it is undisputed that the Cervantes Plaintiffs remained at the scene of the unlawful assembly after the dispersal order was issued.  Further, Plaintiffs have testified that they remained with the crowd, and even close to the skirmish line itself, during the dispersal effort.  Steinberg stated that he and Goodman did not disperse further down Harbor Drive because they wanted to remain close to their car, which was parked in the opposite direction.  (*See* Steinberg Dep. 48:2–43:5.)  Cervantes testified that he and Sanchez stayed by the reporters who had not dispersed because they felt that it would be safe.  (*See* Cervantes Dep. 69:13–14.)  Radasa testified that from his perspective, people who remained "in close proximity to the police" were "demonstrat[ing] their unwillingness to abide by an unlawful assembly order" and were consequently arrested.  (Radasa Dep. 76:21–24.)

The Ninth Circuit's unpublished decision in *Lyons* is instructive.   Plaintiffs challenged their arrests for failing to disperse, alleging that "they did not hear the orders until it was too late to comply."   214 F. App'x at 657.   The Ninth Circuit affirmed the district court's grant of summary judgment on the issue of probable cause.   Specifically, the court found that it was reasonable for officers to have believed there was a "fair probability" that plaintiffs "had heard dispersal orders with which they could have complied" and nonetheless "voluntarily disobeyed."   *Id.* The Court held that this establishes the necessary probable cause to arrest individuals for failing to disperse "even though the police do not actually see or hear (or otherwise know) that any individual person intentionally refused a dispersal order."   *Id.* at 657–58.[22]   Similarly, here, a reasonable jury must find that the arresting officers had a "fair probability," based on the aforementioned circumstances, of believing that the Cervantes Plaintiffs had heard the dispersal orders and voluntarily disobeyed.   *See Blackmore*, 126 F. App'x at 781 (finding probable cause to arrest for failure to disperse where the plaintiff "admit[ted] he did not leave the area voluntarily after repeated requests by the officers to do so and was "part of a large crowd," some members of which "were throwing bottles and rocks at the officers").

And again, as aforementioned, the collective knowledge doctrine does not apply to divest Individual City Defendants of probable cause to believe the Cervantes Plaintiffs were violating the dispersal order.   *See* Section I.B.2.a., *supra*.   There is no evidence in the record that Zimmerman, Radasa, or Euler knew that the Cervantes Plaintiffs had tried to leave the scene earlier and were prevented from doing so.   Indeed, City Defendants have produced testimony that then-Sergeant Radasa, who ordered the arrests of the Cervantes Plaintiffs, believed they were intentionally refusing to comply with the order to disperse. (*See* Radasa Dep. 76:4–21 (testifying that after police had issued "several orders . . . by not only the lieutenant but also our air units" and "in two different languages," people who

---

[22] In *Lyons*, the plaintiffs acknowledged that exits were available and others were able to disperse.   *Id.* at 657.   Here, Plaintiffs claim that they were denied access to exits but do not contest that others were able to leave.   As the Court has previously pointed out, the video footage reflects that many people were able to leave before police began to corral the remaining crowd onto Harbor Drive.

were assaulting officers with rocks and those who were "stop and go" were perceived as uncooperative and arrested).)  Therefore, it is undisputed in the record that the facts known to the officers at the time of arrest were simply that the Cervantes Plaintiffs had not dispersed from an unlawful assembly despite several orders to do so.  *See Delgadillo-Velasquez*, 856 F.2d at 1298.

Therefore, a reasonable jury could not find the arrests unsupported by probable cause.  The evidence is undisputed that the officers drew the reasonable inference that these individuals, who they believed were already acting in defiance of the dispersal order, were continuing to do so at the time of their arrest.  *See Ornelas*, 517 U.S. at 696.  The Cervantes Plaintiffs have not adduced evidence raising a question of fact as to whether City Defendants could reasonably draw this inference.  Because no reasonable jury could find an absence of probable cause under these facts, summary judgment is appropriate on this issue.  *See Gasho*, 39 F.3d at 1428.

### ii.   Plaintiff Pease

As aforementioned, Plaintiff Pease did not join the crowd on Harbor Drive until 6:30 PM, about 20 minutes before his arrest.  Another unlawful assembly declaration was made minutes after his arrival, with a corresponding order to disperse.  (*See* Defs.' Supp. Evid., Video No. 15.)   However, as raised in Section I.A.3., *supra*, Pease appears to state that Radasa's decision to arrest Pease was motivated by an intent to chill his constitutionally protected speech. (Pls.' Opp'n & Cross-Mot. at 20.)

The record includes the following deposition testimony in which Radasa elaborated on the probable cause for arresting Pease:

> I also observed you halting and stopping and not continuously moving, . . . you were actively disobeying our order to disperse properly in the way that we saw fit, as well as you had the opportunity to leave. . . . [T]he [probable cause] was also substantiated by the fact that we gave numerous, numerous orders, coupled with the fact that you were also, in my opinion, encouraging the other people, inciting them to continue with their actions as well, because they were looking at you.  You wore a political sign, like you said.  It says "City Attorney."  You heard on the previous video that somebody you said they thought you were the City Attorney and made a remark about that afterwards. That gives you some credibility, in my opinion. So your verbal, you know, cues to them and your verbal words to them is substantiating their

> justification for staying there and contributing to them doing what they were doing.  So coupled with all of those taken into consideration, the fact that you still did not leave when you should have left, I believe there was probable cause to arrest.

(Radasa Dep. 51:2–52:9.)  Thus, Radasa based his order to arrest Pease on both Pease's apparent refusal to disperse in compliance with a lawful order and on Pease's purported expressive conduct.

Pease's apparent failure to disperse created probable cause for Pease's arrest.  The undisputed facts show that an objectively reasonable officer would have believed a fair probability existed that Pease was willfully failing to disperse.  *See Smith*, 790 F.2d at 792. At the time Pease arrived, law enforcement had been engaged in a two-hour action to disperse the crowd and had no reason to believe Pease was not part of that original crowd. *See Lyons*, 214 F. App'x at 657–58 (finding probable cause existed for arresting protestors for failing to disperse where police reasonably believed plaintiffs taking part in the collective conduct of a group were not "strangers (or even latecomers) to the protest" and had "heard dispersal orders with which they could have complied").  And again, Euler testified that his sole motivation for arresting Pease on Radasa's orders was for Pease's refusal to disperse.  (Euler Dep. 20:11–15; 21:15–28.)

Because probable cause existed for the arrest, Radasa's possible mixed motive for arresting Pease is not sufficient to establish a Fourth Amendment violation in this context. *See Hartman*, 547 U.S. at 259–60 (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway"); *see also Perez Cruz v. Barr*, 926 F.3d 1128, 1138–39 (9th Cir. 2019) ("[I]f a seizure is supported by probable cause, '[t]hat action [is] reasonable whatever the subjective intent motivating the relevant officials.'") (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 736 (2011)).

Thus, the Court finds no reasonable jury could find, on the facts presented, that Pease's arrest was unsupported by probable cause.

### 3.   Qualified Immunity

City Defendants are again entitled to qualified immunity on all Plaintiffs' unlawful arrest claims.  The Cervantes Plaintiffs have failed to show that their Fourth Amendment rights in this context were violated because the undisputed facts show that officers had probable cause to arrest them for failing to disperse.  Moreover, Plaintiffs have pointed to no clearly established law that officers must make an individualized inquiry as to whether each member of a crowd had a reasonable opportunity to disperse before the officer  has probable cause to arrest someone for failing to do so.  In fact, existing case law makes clear that "[c]onclusive evidence of guilt is not necessary to establish probable cause." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984).  Moreover, by nature of being an issue of first impression outside the excessive force context, the scope of the dispersal order, even if unreasonable, cannot be said to have been clearly established at the time it was issued.  *See Gray v. Harris*, No. CV 17-00083-H-BMM-JTJ, 2019 WL 6842517, at *5 (D. Mont. Nov. 7, 2019) (citing *Entler v. Gregoire*, 872 F.3d 1031, 1044 (9th Cir. 2017)) (finding that regarding an issue of first impression, "a reasonable official would not have necessarily understood that they were violating a constitutionally protected right").

As to Pease, it was clearly established at the time of his arrest that officers could not arrest individuals for engaging in expressive conduct if they do not otherwise have probable cause that a crime has been or is being committed.  *See Taylor v. VanGesen*, No. C18-5682 BHS, 2019 WL 4980436, at *7 (W.D. Wash. Oct. 8, 2019) (citing *Hill*, 482 U.S. at 462–63) ("Arrest only on the basis of protected speech violates clearly established First Amendment rights.").  However, the record demonstrates that City Defendants here had probable cause for Pease's arrest.  Thus, the Court finds City Defendants are entitled to qualified immunity as to Pease's unlawful arrest claim as well.

Thus, Zimmerman, Radasa, and Euler are entitled to qualified immunity on Plaintiffs' unlawful seizure claims.  The Court **GRANTS** summary judgment on Plaintiffs' individual Fourth Amendment claims in Individual City Defendants' favor.

**C.** ***Monell* Claim – 42 U.S.C. § 1983 (Count 1)**

City Defendants argue that Plaintiffs' *Monell* claim fails because Plaintiffs have failed to show an underlying constitutional injury and have not presented any evidence of a custom, practice, or policy that caused any injury.  (City Defs.' Mem. of P. & A. at 9.)

To impose liability on governments under § 1983, Plaintiffs must prove that "action pursuant to official municipal policy" caused their constitutional injuries.  *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Thus, to prevail under *Monell*, a plaintiff may establish municipality liability by identifying a policy that constituted the "moving force behind the constitutional violation," *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989), or by showing that a person with "final policymaking authority" caused a constitutional injury, ratified a subordinate's actions that caused the injury, or acted with deliberate indifference to a subordinate's unconstitutional conduct.  *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

Under this analysis, therefore, *Monell* liability on any claim necessarily requires a cognizable constitutional violation.  Because the Court finds that Plaintiffs have failed to raise a factual dispute about the alleged violation of their First Amendment or Fourth Amendment rights, the Court **GRANTS** summary judgment as to Plaintiffs' parallel municipal liability claims against the City.  *See Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (affirming grant of summary judgment in favor of municipal defendants because no constitutional violation occurred).

**D.     California Civil Rights Statutes (Count 3)**

The Cervantes Plaintiffs raise claims under the Ralph Act, Cal. Civ. Code § 51.7, and the Bane Act, Cal. Civ. Code § 52.1, on the basis that Zimmerman and Radasa committed acts of violence or threatened violence, coercion, and/or intimidation because of Plaintiffs' political preference and with the intention of interfering with their constitutional rights.  The Court addresses both statutes separately.

- 33 -

1.   <u>Ralph Act, Cal. Civ. Code § 51.7</u>

Plaintiffs raise a claim under the Ralph Act, Cal. Civ. Code § 51.7, alleging that Zimmerman and Radasa targeted Plaintiffs "due to their membership in an identifiable group: anti-Trump protestors." (Pls.' Opp'n & Cross-Mot. at 19.) "To prevail on their Ralph Act claims, Plaintiffs must establish four elements: (1) Defendants committed or threatened violent acts against Plaintiffs; (2) Defendants were motivated by their perception of Plaintiffs' political affiliation; (3) Plaintiffs were harmed; and (4) Defendants' conduct was a substantial factor in causing Plaintiffs harm." *Campbell v. Feld Entm't, Inc.*, 75 F. Supp. 3d 1193, 1205 (N.D. Cal. 2014). Defendants argue that Plaintiffs have not adduced evidence to support a genuine issue as to any of these elements. (City Defs.' Reply at 14–15.)

The Court agrees. On the first element alone, as Defendants state, the record does not show that Zimmerman or Radasa committed or threatened to commit any violent acts against Plaintiffs. The Ralph Act requires some "physical, destructive act" that goes beyond the "mere application of physical force." *Campbell*, 75 F. Supp. 3d at 1205; *see also Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1289 (9th Cir. 2001) (stating reasonability test for assessing threat of violence under § 51.7). The evidence shows that Zimmerman and Radasa were not involved in any physical action taken against the Cervantes Plaintiffs whatsoever. The facts demonstrate only that Euler was personally involved in Pease's arrest; the evidence does not show that the other named Defendants were involved in any arrests, including the arrests of the Cervantes Plaintiffs. Radasa had ordered teams to carry out arrests, not participated in any arrests himself. (Radasa Dep. 40:5–10.) Further, there is no dispute in the record that Radasa's and Zimmerman's motivation for ordering the arrests was based on the Cervantes Plaintiffs' failure to disperse. (*See* Section I.B.2.b.i., *supra*; Zimmerman Dep. 71:14–73:24.) In opposition, the Cervantes Plaintiffs have neither cited to nor submitted any evidence raising a factual question as to Zimmerman or Radasa's purported acts of violence against them or their unlawful motives. *See Celotex*, 477 U.S. at 323–24.

Given the undisputed facts, summary judgment is appropriate on the Cervantes Plaintiffs' Ralph Act claim.

### 2. Bane Act, Cal. Civ. Code § 52.1

The Bane Act provides a private cause of action against anyone who "interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by an individual or individuals of rights secured by the Constitution or laws of the United States, or laws and rights secured by the Constitution or laws of California." Cal. Civ. Code § 52.1(a).

The parties dedicate their briefings to a discussion about whether Plaintiffs' Bane Act claim states the necessary "force, intimidation, and coercion" to state a claim as a matter of law. First, the Court notes that contrary to City Defendants' argument, the Ninth Circuit has recently held that the Bane Act "does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018).

However, here, Plaintiffs' constitutional claims themselves have not survived summary judgment. The Bane Act requires that the threats, intimidation, or coercion alleged "must result in an interference with a separate constitutional or statutory right." *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 954 (E.D. Cal. 2011) (citing *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 332–34 (1998)) (granting summary judgment on a Bane Act claim because the plaintiff had not been seized or suffered any other cognizable constitutional injury)[23]; *see also Reese*, 888 F.3d at 1040 ("The Bane Act civilly protects individuals from conduct aimed at interfering with rights that are secured by federal or state

---

[23] In *Jones*, the California Supreme Court upheld the appellate court's decision to reverse a jury verdict on a plaintiff's Bane Act claim on the ground that there was no evidence of state action sufficient to demonstrate a violation of the federal or state constitutions. 17 Cal. 4th at 333–34. Plaintiff was therefore not entitled to a jury instruction on the Bane Act. *Id.* at 334. Implicit in the California Supreme Court's holding was that the jury's findings for plaintiff on his ordinary tort claims (false imprisonment and battery) did not suffice to form the necessary statutory predicate for a Bane Act claim. *Rodriguez*, 819 F. Supp. 2d at 954 ("What the *Jones* court did *not* do is hold the error in the jury instruction harmless on the ground that the jury's verdicts finding false imprisonment and battery satisfied the elements of a Bane Act claim in the absence of a constitutional or statutory violation.") (emphasis in original).

law, where the interference is carried out 'by threats, intimidation or coercion.'"); *Venegas v. Cty. of Los Angeles*, 32 Cal. 4th 820, 843 (2004) (stating that the Bane Act "does not extend to all ordinary tort actions because its provisions are limited to threats, intimidation, or coercion that interferes with a constitutional or statutory right").   Here, because Plaintiffs' § 52.1 claim is solely predicated on underlying constitutional claims that have failed as a matter of law, their Bane Act claim also fails as a matter of law.

Accordingly, the Court **GRANTS** summary judgment on the Cervantes Plaintiffs' Ralph Act and Bane Act claims.

### E.    California Tort Law Claims (Counts 4, 5, and 6)

In their Fourth Amended Complaint, the Cervantes Plaintiffs allege that Zimmerman, Radasa, and the City committed the state law torts of false imprisonment, assault and battery, and negligence.  (Fourth Am. Compl. ¶¶ 58–72.)  City Defendants move for summary judgment on the basis that Plaintiffs have failed to identify any statutory authority providing for these causes of action as required by the California Tort Claims Act ("CTCA"), Cal. Gov. Code § 815(a).  (City Defs.' Mem. of P. & A. at 21–22.)[24]

The Cervantes Plaintiffs cite to California Government Code §§ 815.2(a) and 820(a) for their false imprisonment and assault and battery causes of action and to California Civil Code § 1714(a) for the negligence claim.  Section 820(a) provides that "public employees are liable for injuries from their acts or omissions in the scope of their employment to the same extent as private persons, unless otherwise provided by statute."  *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1180 (2003).  This provides the necessary statutory authority for the Cervantes Plaintiffs' tort claims against the Individual City Defendants.

However, Section 815.2(a) is not sufficient to impose direct entity liability on the City.  *Id.*  Similarly, Plaintiffs cannot rely on general tort provisions of the Civil Code,

---

[24] City Defendants also point out that Plaintiffs do not address their tort claims in their summary judgment briefing.  However, the absence of any argument alone by Plaintiff is not enough to find for City Defendants on summary judgment.  *See Martinez v. Stanford*, 323 F.3d 1178 (9th Cir. 2003) (holding that a district court may not grant summary judgment even where the nonmoving party does not file opposing material because the moving party must still meet its independent burden).

including § 1714(a), for public entity liability.  *Id.* at 1183.  Having failed to identify a specific statute declaring the entity itself to be liable or at least creating some specific duty of care for the City, Plaintiffs cannot hold it directly liable for the acts or omissions of Zimmerman or Radasa.

Nevertheless, Plaintiffs can still hold the City *vicariously* liable under § 815.2(a) for the state torts alleged if Zimmerman and Radasa can be found directly liable and are not entitled to any statutory immunity.  *See id.* at 1184; *see also Harvey v. City of Oakland*, No. C07-01681 MJJ, 2007 WL 3035529, at *8 (N.D. Cal. Oct. 16, 2007) ("Under Government Code § 815.2, Plaintiff is not required to invoke any enacting statute to assert liability against the City as long as the officers themselves can be found liable.").

There are several sources of statutory immunity that City Defendants raised as affirmative defenses in their Answer to Plaintiffs' Fourth Amended Complaint.  (*See* Answer at 14, ECF No. 93.)  Notably, however, they do not move for summary judgment on the basis of any of these immunities.  Under California law, statutory immunities are generally affirmative defenses.  *Quigley v. Garden Valley Fire Prot. Dist.*, 7 Cal. 5th 798, 815 (2019).  Defendants bear the burden of proof at summary judgment with respect to affirmative defenses.  *See Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006).

Thus, on summary judgment, Defendants had the burden of showing that the specific conduct giving rise to Plaintiffs' state tort claims were covered by any applicable statutory immunities.  *See Uribe v. Perez*, No. 5:17-CV-00558-CJC (ADS), 2019 WL 2895189, at *10 (C.D. Cal. Mar. 29, 2019) ("Under California law, government defendants have the burden of proving that the actions of government employees fall within scope of a statutory immunity.") (quoting *Rodriguez v. Calif. Highway Patrol*, 89 F. Supp. 2d 1131, 1138 (N.D. Cal. 2000)).  City Defendants have proffered no evidence to support that any of the immunities cited in their Answer apply to the conduct of Zimmerman or Radasa; indeed, they do not mention their statutory immunities at all.

17cv1230 / 18cv1062

Therefore, since the Court finds that the statutory authority cited in Plaintiffs' pleading is sufficient to maintain direct liability tort claims against Zimmerman and Radasa, and because Defendants make no showing regarding statutory immunity, the Court **GRANTS** summary judgment on Plaintiffs' fourth through seventh causes of action only to the extent they seek to state direct liability claims against the City. Summary judgment on Plaintiffs' direct liability tort claims against Zimmerman and Radasa and their vicarious liability claim against the City for these torts is **DENIED**.

### F.   Equitable Claims for Relief (Count 7)

Defendants also move for summary judgment on Plaintiffs' claim for equitable relief. Plaintiffs request "a declaration of rights" that City Defendants' policies, practices, and conduct were unconstitutional, and request a permanent injunction "to prevent Defendants from continuing to enforce California Penal Code §§ 407–409 in a manner in which Defendants arrest individuals merely for being present at an assembly, despite having committed no violent or unlawful act themselves, when the assembly has already been brought under control." (Fourth Am. Compl. ¶ 78, Prayer for Relief.) While this claim was previously dismissed as to County Defendants, it remains on summary judgment against City Defendants. (*See* Order re Cty. Defs.' Mot. to Dismiss at 19–21.)

The Court finds the same reasoning underlying its previous Order dismissing these claims against County Defendants is applicable on summary judgment against City Defendants. City Defendants argue that there is no evidence that Plaintiffs are facing an immediate threat of harm or a significant likelihood of being subjected to the same allegedly unconstitutional conduct at issue in this case. (City Defs.' Mem. of P. & A. at 23.) Having thus demonstrated that Plaintiffs have failed to make a showing sufficient to establish an element essential to injunctive relief, the burden then shifts to Plaintiffs to designate specific facts in the record demonstrating a genuine issue for trial. *See Celotex*, 477 U.S. at 323–24. However, Plaintiffs offer no arguments whatsoever regarding their claims for equitable relief, let alone specific evidentiary citations to support them.

As to Plaintiffs' request for declaratory relief, the Court finds, as it had with County Defendants, that this claim is duplicative because Plaintiffs' remaining § 1983 claims necessarily determine the constitutionality of City Defendants' conduct, thus obviating the need for declaratory relief stating the same.  *See Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1107 (9th Cir. 2011) (holding that courts must consider whether declaratory relief would "serve a useful purpose in clarifying the legal relations at issue"); *see also F.K. ex rel. A.K. v. Department of Educ.*, No. 12–00136 ACK–RLP, 2012 WL 5438989, *5 (D. Haw. Nov. 7, 2012) ("Where a party seeks declaratory relief as to a claim or defense—or part of a claim or defense—the party has already raised, declaratory relief should be denied because it will not avoid impending litigation, and would neither clarify nor terminate the litigation").  Hence, the Court **GRANTS** summary judgment in City Defendants' favor as to Plaintiffs' claims for equitable relief.

In sum, the Court **GRANTS** City Defendants' Motion for Summary Judgment as to Counts 1, 2, 3, 7 and 8.  The Court also **GRANTS** summary judgment on the Cervantes Plaintiffs' direct liability claim against the City in Counts 4, 5, and 6.  Summary judgment for these same counts, however, is **DENIED** as to the Cervantes Plaintiffs' direct liability claims against Zimmerman and Radasa, and their vicarious liability claims against the City.

## II.   <u>County Defendants' Motion for Summary Judgment</u>

Plaintiffs contend that Captain Charles Cinnamo and Sheriff William Gore of the Sheriff's Department violated their First and Fourth Amendment rights on the same basis as stated against City Defendants.  (*See* Section I, *supra*.)  County Defendants move for summary judgment on Plaintiffs' constitutional claims against Cinnamo and Gore in their individual capacities and against the County under *Monell*.  For the reasons stated below, the Court **GRANTS** the County's Motion.

### A.   **First Amendment Claims (Counts 2 and 8)**

County Defendants move for summary judgment as to Plaintiffs' First Amendment claims on the basis that there is no evidence in the record showing Cinnamo's or Gore's

involvement in the police line enforcing SDPD's dispersal order was motivated by an intent to chill Plaintiffs' political speech.  (Cty Mem. of P. & A. at 8–11.)

### 1.    Defendant Cinnamo

Plaintiffs claim that their First Amendment rights were violated because there was no basis for forcibly moving the protestors, including themselves, away from the Convention Center because the confrontations between the supporters and protestors had ended.  (Opp'n & Cross-Mot. at 6.)  Plaintiffs argue that Cinnamo "was directly responsible for implementing [the] decision" to have deputies "under his command" force the crowd, including Plaintiffs, to walk a mile from the protest site "under threat of arrest or force." (Pls.' Opp'n & Cross-Mot. at 18.)

Plaintiffs' claims against Cinnamo stem from the same premise that the skirmish line violated their right to peaceably assemble.  However, as explained above, the Court finds Plaintiffs have not shown a violation of their First Amendment rights occurred because they had no right to remain in the area of an unlawful assembly after being lawfully ordered to disperse.  (*See* Section I.A.2, *supra*.)  Thus, summary judgment is appropriate on this basis alone.

In addition, First Amendment violations require that a plaintiff provide evidence showing that "by his actions [the defendant] deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct." *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994) (citing *Mendocino Env'l Ctr.*, 14 F.3d at 464).  County Defendants also move for summary judgment on the basis that Plaintiffs have not shown that Cinnamo's involvement in creating the skirmish line to disperse the crowd was motivated by an intent to chill their political speech.  Defendants argue that the record shows only that Cinnamo helped formulate the skirmish line strategy to fulfill his mutual aid obligations with SDPD.  In response, Plaintiffs cite to Cinnamo's

17cv1230 / 18cv1062

statement that he believed it made sense to move the crowd of mainly protestors toward Chicano Park.[25]  (Pls.' Opp'n & Cross-Mot. at 18.)

Plaintiffs fail to raise a genuine issue of material fact as to Cinnamo's motive.  While Cinnamo was apparently aware that the crowd he recommended moving out of the vicinity of the Convention Center was protesting the rally, he alleges that the reason for forcibly pushing the protestors southeast was based on the perceived location of the crowd's origin, not the content of their message.  (Cinnamo Decl. ¶ 12 ("It made sense to move these remaining folks southeast on Harbor Drive, since the majority of them appeared to be the same protesters we had earlier watched arrive at the rally in a march from Chicano Park.").)  This evidence is not "significantly probative" such that it defeats summary judgment.  *See Anderson*, 477 U.S. at 249.

Moreover, the record is replete with neutral reasons supporting Cinnamo's decision to recommend the skirmish line as a crowd control mechanism.  Cinnamo's decision about the necessity of the skirmish line was based on his understanding that those who remained in the area of the unlawful assembly were violating the law.  (*See* Cinnamo Dep. 52:18–53:22.)  He stated that the skirmish line plan was based on an evaluation of video surveillance and was intended "to get the remaining crowd members to disperse voluntarily" and "to avoid arresting people to the extent possible."  (Cinnamo Dep. 75:3–8; Cinnamo Decl. ¶ 13; *see also* Cinnamo Dep. 51:4–8 (testifying that the idea behind the skirmish line was to "us[e] the least amount of force, if any at all" to prevent the crowd from returning to the Gaslamp area).)  He alleges that the plan was developed in response to an unfolding situation in real time and was not developed beforehand.  (Cinnamo Dep. 75:9–76:1.)[26]

---

[25] While it is unclear whether Plaintiffs cited to this specific statement for evidence of unlawful motive, the Court construes it as such to draw all inferences in favor of the non-moving party.  *See Matsushita*, 475 U.S. at 587.

[26] To the extent Plaintiffs allege that Cinnamo's decisions about the distance of the dispersal were motivated by an intent to chill their speech, Cinnamo testified that he played no role in determining when the skirmish line would stop moving south because "[t]hat was a decision made by San Diego PD staff." (Cinnamo Dep. 72:15–18.)

1    Plaintiffs offer no other evidence to support the existence of an unlawful motive.

2    The Court therefore finds that no reasonable jury could find by a preponderance of the

3    evidence that the plaintiff has shown a First Amendment violation on this basis.  *See id.* at

4    252 (finding that a scintilla of evidence is not enough to carry a plaintiff's burden on

5    summary judgment to show that reasonable jurors would find for plaintiff by a

6    preponderance of the evidence).

7                    2.    Defendant Gore

8    County Defendants also argue that they are entitled to summary judgment regarding

9    Gore's liability for First Amendment violations because there is no evidence that he "was

10   at all involved in, or at any point became aware of, or approved of, the decision to form

11   and use the skirmish line."  (Mem. of P. & A. in supp. of Cty. Defs.' Mot. ("Cty. Defs.'

12   Mem. of P. & A.") at 10, ECF No. 127-1.)   In response, Plaintiffs allege that Gore

13   "ratif[ied] the actions of Cinnamo and the Sheriff's Department after the fact[.]"  (Pls.'

14   Opp'n & Cross-Mot. at 11.)

15   Again, however, Plaintiffs have not shown a First Amendment injury arising from

16   the skirmish line.  Even if they had, County Defendants are correct that Plaintiffs have not

17   supported any such injury with evidence of Gore's direct liability.

18   "A supervisor is only liable for constitutional violations of his subordinates if the

19   supervisor participated in or directed the violations, or knew of the violations and failed to

20   act to prevent them."  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Plaintiffs do not

21   appear to argue—and have not pointed to any evidence to support—that Gore affirmatively

22   participated in the skirmish line and subsequent dispersal down Harbor Drive, or had

23   contemporaneous knowledge of these actions.  *See Humphries v. Cty. of Los Angeles*, 554

24   F.3d 1170, 1202 (9th Cir. 2009) ("Under § 1983, a supervisor is only liable for his own

25   acts.  Where the constitutional violations were largely committed by subordinates the

26   supervisor is liable only if he participated in or directed the violations."), *overruled on*

27   *other grounds by Los Angeles Cty., Cal. v. Humphries*, 569 U.S. 29 (2010).   Moreover,

28   Plaintiffs do not appear to rely on a direct supervisory liability theory concerning Gore in

- 42 -

their Cross-Motion and Opposition at all; rather, they assert a "ratification" theory of liability that is properly considered under *Monell*. *See Christie*, 176 F.3d at 1238.

Thus, the Court finds that there is no genuine dispute of material fact regarding Gore's individual liability for First Amendment violations.

### 3. Qualified Immunity

Based on the above findings, Cinnamo and Gore are entitled to qualified immunity because there is no evidence that either Defendant violated Plaintiffs' First Amendment right to peaceably assemble. *See Ashcroft*, 563 U.S. at 735 (holding that a plaintiff can overcome qualified immunity only by showing both that an official violated a statutory or constitutional right and that the right was clearly established at the time of the violation). As stated previously in Section I.A.4., Plaintiffs have failed to show that a right was violated or that any such right was clearly established. Cinnamo and Gore are therefore entitled to qualified immunity on Plaintiffs' First Amendment claim.

For the foregoing reasons, the Court grants summary judgment on Plaintiffs' First Amendment claims against Cinnamo and Gore.

### B. Fourth Amendment Claims (Counts 2 and 8)[27]

Defendants contend that Plaintiffs have not made a sufficient showing as to Cinnamo's and Gore's involvement in a violation of their constitutional rights, that Plaintiffs seek to rely on a different theory of liability for Cinnamo at the summary judgment stage, and that in any event, both Cinnamo and Gore are entitled to qualified immunity. (Cty. Defs.' Mem. of P. & A. at 1.)

Again, the Court adopts its above reasoning and concludes that Plaintiffs have not shown that a violation of their Fourth Amendment rights occurred. *See* Section II.B.2., *supra*. However, the Court below provides additional reasons for granting summary judgment specific to the arguments in County Defendants' briefs.

---

[27] Plaintiffs Cervantes, Sanchez, Goodman, and Steinberg bring a First and Fourth Amendment claim under 42 U.S.C. § 1983 against Cinnamo and Gore. Plaintiff Pease separately alleges violations of these same amendments against only Cinnamo.

1.   <u>Arrests</u>

(a)   *Defendant Cinnamo*

In their Fourth Amended Complaint, Plaintiffs claim that Cinnamo, the highest Sheriff's Department authority at the command post, ordered deputies "to provide support and backup" to officers arresting Plaintiffs.  (Fourth Am. Compl. ¶¶ 6–8, 47.)  They also claim that Cinnamo directed officers to take custody of "anyone who appeared to still be protesting, demonstrating, or assembling in their immediate vicinity" even though those at the command post "could plainly see [the protestors] had committed no crime."  (*Id.*)

In the County Defendants' Motion for Summary Judgment, Cinnamo states that he did not order or participate in any arrests.  (Cinnamo Decl. ¶ 24.)  In their consolidated Opposition/Cross-Motion, Plaintiffs do not dispute this fact.  Rather, they argue that Cinnamo is liable for violations of Plaintiffs' Fourth Amendment rights by allowing Sheriff's deputies "to process and book Plaintiffs into the County Jail rather than inform SDPD command that these were false arrests[.]" (Opp'n & Cross-Mot. at 19.)  County Defendants contend that summary judgment should be granted on this theory of liability because Plaintiffs failed to raise it in their Fourth Amended Complaint.  (Cty. Defs.' Reply at 3–4.)

The Court agrees.  Rule 8(a) of the Federal Rules of Civil Procedure requires that a pleading provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 167 (1993) (internal quotations omitted); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.").

As such, "in most instances, notice may not be effected through discovery alone"; instead, "a plaintiff must amend the complaint or otherwise incorporate new allegations." *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-CV-01282-KJM-AC, 2014 WL 1330754, at *5 (E.D. Cal. Mar. 28, 2014); *see also Pickern v. Pier 1 Imports (U.S.), Inc.*, 339 F. Supp. 2d

- 44 -

1081, 1088 (E.D. Cal. 2004) (holding that allowing a plaintiff to "incorporate any new factual allegations without seeking amendment would read the 'fair notice' requirement out of Rule 8(a)"), *aff'd*, 457 F.3d 963 (9th Cir. 2006).  For this reason, if a complaint "does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court."  *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008); *see also Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[S]ummary judgment is not a procedural second chance to flesh out inadequate pleadings."); *Pickern*, 457 F.3d at 968–69.

Here, the Fourth Amended Complaint put Cinnamo on notice that Plaintiffs sought to hold him personally liable for ordering the allegedly unlawful arrests of Plaintiffs.  In its July 29, 2019 order, the Court held specifically that Plaintiffs' § 1983 individual capacity claims against Cinnamo withstood a Rule 12(b)(6) challenge because Plaintiffs had sufficiently stated that Cinnamo, by allegedly ordering Sheriffs' deputies to engage in or assist with arresting Plaintiffs, "set in motion a series of acts" that he knew, or should have known, would inflict constitutional injury.  (Order re Cty. Defs.' Mot. to Dismiss at 19.)[28] Cinnamo thus focused his defense on the argument that he did not order or direct any arrests on the day of the rally, emphasizing his secondary role to the SDPD.  (*See, e.g.*, Decl. of Charles Cinnamo ("Cinnamo Decl.") ¶¶ 10, 15, 24, ECF No. 127-3; Deposition of Charles Cinnamo ("Cinnamo Dep.") 29:24–30:13, Ex. A to Notice of Lodgment ("Lodgment"), ECF No. 127-2.)  In fact, it appears Plaintiffs have stipulated to the non-involvement of the Sheriff's Department in arresting them.  (*See* JSUF ¶ 14 ("No deputies were part of the police line at the time Plaintiffs were arrested.").)  Instead, Plaintiffs have shifted their theory to hold Cinnamo liable for failing to intercede in the arrests on the basis of a

---

[28] *See also id.* at 11 ("To the extent Plaintiffs allege that Captain Cinnamo[] ***ordered*** Plaintiffs' arrests with knowledge that there was no probable cause for the arrests, Plaintiffs have adequately pleaded Fourth Amendment violations for the Section 1983 claims against the County.") (emphasis added).

completely different action—allowing deputies to process and book Plaintiffs at the County Jail.

Failure to intercede imposes on officers "a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen." *U.S. v. Koon*, 34 F.3d 1416, 1447 (1994), *rev'd on other grounds*, 518 U.S. 81 (1996). However, officers can only be held liable for failing to intercede if they were present and had a "realistic opportunity" to do so. *Cunningham v. Gates*, 229 F.3d 1271, 1289–90 (9th Cir. 2000), *as amended* (Oct. 31, 2000). This theory also requires that the officer has contemporaneous knowledge that a constitutional violation was taking place. *See Ramirez v. Butte-Silver Bow Cty.*, 298 F.3d 1022, 1029 (9th Cir. 2002), *aff'd sub nom. Groh v. Ramirez*, 540 U.S. 551 (2004) (affirming dismissal of failure to intercede claim regarding unlawful search where line officer "was not aware that the warrant was defective until long after search was completed"). Because this theory was not stated at the pleading stage, Cinnamo had no reason to address the elements of a failure to intercede claim, such as whether he knew, at the time of Plaintiffs' arrests, that the arrests were not based on probable cause, or whether he had a "realistic opportunity" to intercede.[29, 30] Cinnamo's role in or knowledge about

---

[29] Arguably, Plaintiffs may be stating "the same theory on the basis of different facts"; namely, that Plaintiffs' unlawful arrest was caused by either Cinnamo's affirmative act (ordering the arrest) or omission (failing to intercede). *See Pena*, 2014 WL 1330754, at *5. However, even where this is the case, Plaintiffs still did not provide the requisite notice under Rule 8. *See id.* (distinguishing between prejudice to the defendant and requisite notice, and declining to consider an argument that, while not prejudicing defendants, still failed to satisfy the notice requirements of Rule 8).

[30] Some courts argue that *Coleman*, which barred a plaintiff from proceeding on summary judgment with a theory not stated in the complaint, nonetheless allowed plaintiffs to pursue a new theory "if [the plaintiff] made it known during discovery of her intention to pursue recovery under that theory." *Gartner, Inc. v. Parikh*, CV 07–2039–PSG, 2008 WL 4601025, at *6 (C.D. Cal. Oct. 14, 2008) (citing *Coleman*, 232 F.3d at 1294); *see also Ortega v. Neil Jones Food Co.*, No. 12-CV-05504-LHK, 2014 WL 232358, at *5 (N.D. Cal. Jan. 21, 2014). Parts of Cinnamo's deposition include some discussion of actions Cinnamo would have taken if he disagreed with the declaration of unlawful assembly and the subsequent arrests, only partially excerpted by Plaintiffs. (Cinnamo Dep. 54:21–55:25, Ex. 4 to Pease Decl.., ECF No. 139-2.) However, the Court cannot conclude, based on these partial excerpts attached to Plaintiffs' brief, that Plaintiffs made known their intention to pursue a failure to intercede theory of liability. Moreover, despite having an opportunity to make this intention clear by pleading this theory in their Fourth Amended Complaint, filed seven months after Cinnamo's deposition, they did not do so.

the booking and processing of Plaintiffs at the County is not part of the factual record whatsoever.  Indeed, other evidence reflects that Cinnamo played a very limited role in the day's events and had turned over control and direction of sheriffs' deputies to SDSD at the beginning of the day.  (Cinnamo Dep. 19:10–20:8, 19:25–20:3, 20:9–17, 37:1–10; 37:23–38:1.)[31]

By abandoning on summary judgment the original claim that Cinnamo directed their unlawful arrest—and instead using Cinnamo's failure to intercede as the basis for his liability—Plaintiffs have raised a new theory of liability for which Cinnamo did not have fair notice during the pleading stage.  Ninth Circuit precedent establishes that this is not permissible.  *See Navajo Nation*, 535 F.3d at 1058; *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010) (noting the plaintiff "may not effectively amend its Complaint by raising a new theory of standing in its response to a motion for summary judgment").  Therefore, summary judgment in favor of County Defendants is appropriate because Plaintiffs did not provide sufficient notice to County Defendants of their intent to proceed on this theory of liability.

(b)     *Defendant Gore*

Plaintiffs allege that Gore (1) ratified the pre-planned operation to force protestors away from the Convention Center and to subsequently arrest them and (2) delegated final decisionmaking authority Cinnamo to carry out the operation.  (Fourth Am. Compl. ¶¶ 43, 44, 49.)  As aforementioned, Plaintiffs' statements appear to allege a theory of *Monell* liability, discussed further in Section II.C, *infra*, rather than a theory of personal liability against Defendant Gore.  However, even if Plaintiffs intend to hold Gore personally liable for "setting in motion" their allegedly unlawful arrest by directing Cinnamo's decisions, this argument is foreclosed by the undisputed fact that Cinnamo did not order Plaintiffs' arrest.  (Cty. Defs.' Mot. at 7–8.)

---

[31] Excerpts of the Cinnamo deposition transcript are attached to County Defendants' Motion as Exhibit A to Notice of Lodgment (ECF No. 127-2) and to Plaintiffs' Cross-Motion and Opposition as Exhibit 4 to the Pease Declaration (ECF No. 139-2).

A direct supervisory liability claim under § 1983 that does not allege a supervisor's personal involvement must show "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989). Even if Plaintiffs could show that Gore influenced Cinnamo's decision on the day of the rally, Plaintiffs have not shown that Cinnamo committed any constitutional violations. Therefore, Gore cannot be the proximate cause of any injuries such that he can be held personally liable for them. *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1447 (9th Cir. 1991) (holding that direct supervisory liability requires plaintiffs to 'show the supervisor breached a duty to plaintiff which was the proximate cause of the injury'") (quoting *McClelland v. Facteau*, 610 F.2d 693, 695 (10th Cir. 1979)).

Therefore, there is no genuine dispute of material fact as to Sheriff Gore's liability for Plaintiffs' allegedly unlawful arrests.

(c)     *Qualified Immunity*

Based on the above findings, Cinnamo and Gore are entitled to qualified immunity because there is no evidence that either Defendant violated Plaintiffs' constitutional right to be free from unlawful arrests. *See Ashcroft*, 563 U.S. at 735 (holding that a plaintiff can overcome qualified immunity only by showing both that an official violated a statutory or constitutional right and that the right was clearly established at the time of the violation). Cinnamo and Gore are therefore entitled to qualified immunity.

2.     Forced Movement Down Harbor Drive

Although not addressed by County Defendants, Plaintiffs also make a claim that the forced movement to Barrio Logan violated their right to be free from unlawful seizures. (Pls.' Opp'n & Cross-Mot. at 17.) The Court relies on its reasoning in Section I.B.2.a., *supra*, in finding that the use of a skirmish line to push Plaintiffs down Harbor Drive was not an unreasonable seizure.

Moreover, Cinnamo and Gore are entitled to summary judgment on the question of qualified immunity. They argue that the rights alleged were not "clearly established" because no binding authority has held that officers providing mutual aid to another agency

"may be liable under the First or Fourth Amendments" for how the lead agency decides to enforce unlawful assembly declarations or for "[a]ssisting the lead agency in enforcing a lawful dispersal order by participating in a skirmish line for half of a mile."  (Cty. Defs.' Mem. of P. & A. at 12–13.)

For the same reasons stated in Sections I.A.4.a. and I.B.3., *supra*, Plaintiffs have again failed to satisfy their burden.  Plaintiffs provide only quotations from case law stating the general rule for a seizure and finding the occurrence of a seizure where police "physically mov[e]" and "circumscrib[e] the area of movement" of a crowd.  (Pls.' Opp'n & Cross-Mot. at 17.)  Nowhere in their brief do Plaintiffs address County Defendants' specific argument that there is no clearly established law holding them liable for a mutual aid action, nor do Plaintiffs point to any case law establishing that seizures of this type are unreasonable under the Fourth Amendment.  *See Sharp*, 871 F.3d at 911 ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these deputies in this case that their particular conduct was unlawful.").  Thus, Cinnamo and Gore are entitled to qualified immunity on this claim.

For the foregoing reasons, the Court **GRANTS** County Defendants' summary judgment on Plaintiffs' individual capacity claims against Cinnamo and Gore for violations of their Fourth Amendment rights.

## C.    *Monell* Claim (Count 1)

As aforementioned, *Monell* liability exists only if there is an underlying constitutional injury.  The Court has found that no reasonable jury could find that Plaintiffs' First Amendment rights were violated, or that they have raised a factual dispute regarding their unlawful arrest claim under the Fourth Amendment.  As such, the Court grants summary judgment as to Plaintiffs' parallel municipal liability claims against the County. *See Scott*, 39 F.3d at 916.

In sum, the Court **GRANTS** County Defendants' Motion for Summary Judgment as to all claims (Counts 1, 2, and 8).

### III.   **Plaintiffs' Cross-Motion for Summary Judgment**

Plaintiffs also purport to move for summary judgment on all claims as to City and County Defendants' liability.  (Pls.' Opp'n & Cross-Mot. at 21.)  To the extent Plaintiffs' brief can be construed as a Cross-Motion for Summary Judgment, Plaintiffs fall far short of their burden to come forward with evidence entitling them to a directed verdict on their claims.

Generally, "when simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).  When, as here, the party moving for summary judgment would bear the burden of proof at trial, "it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quotations omitted).  "In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *Id.* (quotations omitted).

First, the Court notes that Plaintiffs' single, 21-page brief purports to combine their Cross-Motion and Opposition, but do not distinguish between the issues on which they seek judgment and any issues on which they merely oppose summary judgment for Defendants.[32]  Plaintiffs do not cite to any summary judgment standards to indicate whether they are raising a genuine issue of material fact to defeat summary judgment in favor of Defendants, or whether they are attempting to establish an absence of a genuine issue as to each claim to support a finding of summary judgment in their favor.  Further, Plaintiffs

---

[32] Indeed, the first nine pages—under the header "Introduction"—allegedly summarize the events of the day of the rally that are reflected in the body-worn camera footage and are therefore "beyond any reasonable dispute," although the events giving rise to Plaintiffs' claims do not begin until page six.  After a brief summary of the arguments, the Cross-Motion and Opposition then continues with a recitation of the "facts" for about four pages, with only two citations to the record—one to a body-worn camera video and another to the Deposition of David Myers.  As with the remainder of this Order, the Court relies only on the facts as they appear in the evidentiary record, including the body-worn camera footage, and not as they are presented in Plaintiffs' brief.

only raise specific arguments as to the existence of constitutional injuries, the liability of County Defendants, and their Bane Act claims against City Defendants.

Plaintiffs have not submitted any additional evidence to specifically support their Cross-Motion.  Therefore, the Court already considered Plaintiffs' evidence in support of their summary judgment motion in the above analysis regarding Defendants' summary judgment motions.  The Court therefore relies on its above determinations with regard to these issues, which includes consideration of Plaintiffs' evidence submitted to demonstrate that their First Amendment right to peaceably assemble was violated.  Plaintiffs adduce no factual support either showing that they had any right to remain in the area of the unlawful assembly after being ordered to disperse or evincing any motive on behalf of Defendants to chill their speech by dispersing them down Harbor Drive.  Similarly, as aforementioned, no reasonable jury could find, based on the factual record, that Plaintiffs' initial seizure via the skirmish line and their subsequent arrests were not supported by probable cause.  (See Section I.B.2., *supra*.)

Because the facts in the record fail to create a genuine issue of material fact to *defeat* Defendants' summary judgment motions on Plaintiffs' constitutional claims, it follows that this same evidence cannot establish the much higher burden that Plaintiffs are *entitled* to summary judgment on these same claims.  Without having met their burden to show constitutional injuries, the related claims against County Defendants and Plaintiffs' Bane Act claim cannot lie.

Lastly, Plaintiffs' arguments regarding its Ralph Act claim purports to address only the first element of the claim: the commission of violence or threats of violence.  (Pls.' Opp'n & Cross-Mot. at 19–20.)  Plaintiffs state that the decision to move the protestors south on Harbor Drive constituted an act of violence sufficient for the claim; they provide no further facts to support that the act was the result of unlawful motivations and, in fact, do not identify which "Defendants" were specifically responsible for it.  For the reasons discussed in Section I.D.1., Plaintiffs fall far short of satisfying their burden for summary judgment in their favor.

The Court therefore **DENIES** Plaintiff's Cross-Motion for Summary Judgment on all claims.

### IV.   Supplemental Jurisdiction

Under 28 U.S.C. § 1367(a), district courts "have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy . . . ."  However, districts courts may decline this jurisdiction if all claims over which it has original jurisdiction have been dismissed. 28 U.S.C. § 1367(c)(3).

The Court has granted summary judgment in Defendants' favor on the § 1983 claims that give this Court federal question jurisdiction.  Thus, only the Cervantes Plaintiffs' state tort claims remain in this case.  Finding that the balance of the relevant factors does not "tip in favor of retaining the state-law claims" after the dismissal of the federal claims, the Court declines to exercise supplemental jurisdiction over these claims pursuant to § 1367(c)(3).  *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 911 (9th Cir. 2011) (holding that the district court did not abuse its discretion in declining supplemental jurisdiction over state law claims after granting summary judgment on federal claims); *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").  Plaintiffs may pursue their state law claims in state court.

17cv1230 / 18cv1062

**CONCLUSION**

Accordingly, the Court:

(1) **GRANTS** City Defendants' Motion for Summary Judgment as to Counts 1, 2, 3, 7 and 8;

(2) **GRANTS IN PART** and **DENIES IN PART** City Defendants' Motion for Summary Judgment as to Counts 4, 5, and 6;

(3) **GRANTS** County Defendants' Motion for Summary Judgment as to Plaintiffs' remaining claims against the County (Counts 1, 2, and 8);

(4) **DENIES** Plaintiff's Cross-Motion for Summary Judgment; and

(5) **DISMISSES** the remaining state law claims (Counts 4, 5, and 6) under 28 U.S.C. § 1367(c)(3) **WITHOUT PREJUDICE** to being re-filed in state court.  *See Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1150 (S.D. Cal. 2006).

The Clerk is directed to enter judgment in accordance with this order.

**IT IS SO ORDERED.**

**DATED: September 25, 2020**

Hon. Cynthia Bashant
**United States District Judge**

17cv1230 / 18cv1062